UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK A. MANEELY,<br><br>   Plaintiff,<br><br>  v.<br><br>Hon. MICHAEL B. DONLEY,<br>SECRETARY OF THE UNITED STATES AIR<br>FORCE,<br><br>   Defendant. | Civil Action No. 10-00991 (BJR)<br><br>MEMORANDUM OPINION |

**GRANTING DEFENDANT'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT, AND**

**DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a motion to dismiss and a motion for summary judgment by Defendant Michael B. Donley,[1] Secretary of the United States Air Force (hereinafter "Secretary"). See Def's Mot., Dkt. #2. Plaintiff Mark A. Maneely has also filed a cross-motion for summary judgment. See Pl's Mot., Dkt. #11. Maneely alleges that the Secretary's decision (through a military corrections board) to raise his disability rating from 40 to 60 percent, rather than to 100 percent, was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise contrary to the law, in violation of the Administrative Procedure Act (APA). Maneely also claims that the Secretary's decision contradicted applicable regulations and thereby deprived him of his constitutional right to due process under the law. The Secretary moves to dismiss Maneely's constitutional claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and moves for summary judgment on the APA claims under Rule 56. Having reviewed the parties' briefs, together with all other relevant

---
[1] Defendant Michael P. Donley is no longer the Secretary of the Air Force. This does not affect the parties' substantial rights. *See* Federal Rule of Civil Procedure 25(d).

1

materials, the Court grants the Secretary's motions and denies Maneely's motion, for the reasons explained below.

I.   FACTUAL AND PROCEDURAL BACKGROUND

Maneely enlisted in the United States Air Force (hereinafter "USAF") on January 17, 1984. Administrative Record (hereinafter "AR") 32. He began experiencing symptoms of pain, fatigue, and weight gain in 1996. AR 172. Similar symptoms reoccurred in 1998, and returned again in 2000, lasting longer. *Id.* Maneely's conditioned worsened to the point that his supervisor, William McCasland, relieved him of his duties as a division chief and created a new position for him as McCasland's chief of staff. AR 39. The reassignment was intended to accommodate Maneely's deteriorating physical health, limited endurance, unpredictable work schedule, and periodic hospitalizations. AR 39, 44.

After the reassignment, on April 10, 2003, Dr. Eric Goldman diagnosed Maneely with 1) idiopathic chronic fatigue, 2) myofascial pain, 3) idiopathic episodic nausea, vomiting, and abdominal pain, 4) hypertension, 5) chronic gastritis, and 6) presumptive non-alcoholic steatohepatitis/fatty liver. AR 36. Dr. Goldman recommended that Maneely meet a Medical Evaluation Board (MEB), which convened on June 24, 2003.[2] AR 36, 40. The MEB concurred in Dr. Goldman's diagnoses, and referred Maneely to an Informal Physical Evaluations Board (IPEB).[3] AR 40.

The MEB also requested supplemental documentation from Maneely's supervisor, McCasland. AR 44. In a memo dated June 26, 2003, McCasland described the reassignment as

---

[2] Dr. Goldman made the recommendation pursuant to Air Force Instruction (AFI) 36-3212, which governs "Physical Evaluation for Retention, Retirement, and Separation," and AFI 48-123, which covers "Medical Examinations and Standards." AFI 36-3212 establishes the procedures for the physical evaluation of personnel, including procedures for confirming a diagnosis and processing internal appeals.
[3] *See* AFI 36-3212, Ch. 2.

an effort to offer Maneely "less strenuous work, more time for medical treatment, and rest," in light of Maneely's "continuingly degrading medical condition." *Id.* According to McCasland, Maneely had "considerably less demanding" duties post-reassignment, and though Maneely "contribute[d] in a very limited fashion," he was "not medically fit for continued military service." *Id.* McCasland explained that "the quality of [Maneely's] work continues to be exemplary," but fatigue, pain, and frequent absences "make him unreliable for sustained, efficient performance." *Id.* In response to the written question "Does member work full duty shifts?", McCasland wrote: "No. Lt Col Maneely routinely is in his office 3-4 hours per day, 4-5 days per week." AR 45. Maneely's immediate supervisor, Kirt Moser, also submitted a memo to the MEB describing a "rapid decline" in Maneely's health, and praising Maneely's perseverance. AR 47. Maneely himself told the MEB that he was "able to work 2-4 hours/day, 4-5 days/week." AR 42.

The IPEB met on July 9, 2003, and recommended permanent retirement with a 40 percent disability rating. AR 3. Prior to a meeting of the Formal Physical Evaluation Board (FPEB),[4] which reviews IPEB findings, McCasland and Moser submitted additional memoranda. McCasland maintained that Maneely was "currently strong enough to deliver only 3 or 4 hours of work during a duty day, and rarely has the endurance for a full week of duty days, typically missing a day or two a week." AR 52. McCasland further stated that Maneely "is no longer ever capable of performing as much as one quarter of the capacity he was when healthy." *Id.* Moser echoed McCasland in asserting that Maneely "is able to spend only 3-4 productive hours before being overcome by fatigue and pain." AR 53. Moser estimated that Maneely "is only able to muster about 20 productive waking hours in a week," and "beyond the 12 to 15 hours at the office, he collapses and is, in essence, bedridden." *Id.* In Moser's assessment, Maneely was

---
[4] *See* AFI 36-3212, Ch. 3 (describing procedures for IPEB and FPEB).

"currently functioning at less than 10 percent of his healthy capacity, and he continues to get worse." *Id.*

The FPEB convened on September 11, 2003, and concurred with the IPEB's findings and recommendation. AR 49. In its findings, the FPEB report noted Maneely's work schedule and symptoms. AR 50. The report also observed that Maneely's medical profile "does not address any duty hour limitations," and that Maneely's frequent visits to the Veterans' Administration emergency rooms "raised concerns on [the VA's] part about drug seeking behavior." *Id.* The FPEB discussed a "lack of life skills involvement" in Maneely's case, calling attention to the recommendation from a pain management specialist that Maneely see a pain psychologist and myofacial therapist. *Id.* The FPEB could not ascertain whether Maneely followed that recommendation. *Id.* Finally, the FPEB opined that Maneely's "near constant bed rest; limited duty day and lack of exercise are somewhat self-imposed," given the absence of any statement from Maneely's physician recommending those measures. *Id.* The FPEB listed Maneely's "unfitting" condition, i.e. the condition making him unfit for duty, as "idiopathic chronic fatigue associated with myofascial pain," and assigned Veterans' Administration Diagnostic Code 6354, which corresponds to chronic fatigue syndrome (CFS).[5] *Id.*

This diagnostic code is drawn from the Department of Veterans' Affairs Schedule for Rating Disabilities (VASRD), codified at 38 C.F.R. Part 4. 38 C.F.R. § 4.88b describes the symptoms of CFS as "debilitating fatigue, cognitive impairments (such as inability to concentrate, forgetfulness, confusion), or a combination of other signs and symptoms." A 40 percent disability rating associated with CFS is appropriate where symptoms "are nearly constant and restrict routine daily activities to 50 to 75 percent of the pre-illness level," or where symptoms "wax and wane, resulting in periods of incapacitation of at least four but less than six

---

[5] *See* 38 C.F.R. Part 4.88b.

weeks total duration per year." 38 C.F.R. § 488b.

After the FPEB made its recommendation, Dr. Goldman (Maneely's treating physician) submitted an additional memo in which he maintained that Maneely "has always been compliant with my diagnostic and therapeutic recommendations, as well as those of specialty consultants." AR 54. Dr. Goldman addressed the concern of drug seeking behavior, suggesting that Maneely was just seeking medications that had afforded relief in the past. *Id.* Dr. Goldman also challenged the FPEB's description of Maneely's bed rest and inactivity as "self-imposed." He attested that he had personal knowledge of Maneely's supervisors encouraging Maneely to go home and rest, and emphasized that CFS sufferers have no choice regarding their inactivity. *Id.*

Maneely submitted a rebuttal to the Secretary of the Air Force Personnel Council (SAFPC),[6] but the SAFPC chose to adopt the findings and recommendation of the lower boards on December 17, 2003. AR 67. Maneely was permanently retired with a 40 percent disability rating.[7] The SAFPC noted Maneely's recurring fatigue and myofascial pain, as well as the "audible distress" Maneely displayed in his testimony before the FPEB. *Id.* However, "absent a measurable functional deficit, i.e., impaired neuropsychiatric function or an identifiable underlying medical disorder as the source of [Maneely's] subjective fatigue," the SAFPC "found no objective basis upon which to justify a change in the disability rating." *Id.* Maneely was honorably discharged on February 27, 2004. AR 32.

He applied to the Air Force Board for the Correction of Military Records (AFBCMR) on February 15, 2006, seeking a correction of his records to reflect a 100 percent disability rating, due to total disability and unemployability.[8] AR 7-8, 18. Maneely gave eight reasons in support

---

[6] *See* AFI 36-3212 Ch. 5.
[7] *See* 10 U.S.C. § 1201 (permitting the Secretary to retire "unfit" members and make disability determinations).
[8] *See* 10 U.S.C. § 1552(a) ("The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice").

5

of his request for correction: (1) the IPEB's 40 percent recommendation was arbitrary (AR 12); (2) the medical and physical evaluation boards ignored symptoms other than chronic fatigue and myofascial pain (AR 14); (3) the boards erred in not performing additional medical tests (AR 15); (4) the FPEB applied the incorrect diagnostic code, as Maneely does not have CFS (AR 17); (5) regulations required the assignment of a by-analogy code in the absence of a definitive diagnosis (AR 18); (6) Maneely should have been considered unemployable and totally disabled (AR 18); (7) the boards did not offer sufficient explanation for their decisions; (AR 20); and (8) the boards failed to grant Maneely the "benefit of the doubt" under circumstances where two disability ratings could be applied (AR 21).

The AFBCMR sought advisory opinions from its Medical Consultant, Colonel Edward Taxin, and from the USAF Personnel Center, Directorate of Personnel Program Management, Physical Disability Division (hereinafter "DPPD"). AR 172-77. Col. Taxin determined at the outset that Maneely's symptoms "failed to meet the VASRD criteria for Chronic Fatigue Syndrome."[9] AR 175. However, Col. Taxin acknowledged that MEBs can consider an applicant's condition by analogy to a condition described in the VASRD, such as CFS. *Id.* Col. Taxin's report quotes McCasland's and Moser's estimates of the amount of work Maneely could perform, and relies upon those estimates in assessing the appropriate disability percentage. AR 173, 175. Assuming a minimum of three hours of work per day, three days per week, Col. Taxin hypothesized a minimum of "9 hours of work per week or 22.5 percent of a typical work week." AR 175. Thus, "in rating the applicant, it appears that his level of activities was diminished by between 50 and 100 percent of his normal duty performance and would justify a disability rating

---

[9] The VASRD criteria for CFS appear at 38 C.F.R. § 4.88a.

of 60 percent."[10] *Id.*

In addition to recommending that Maneely receive a 60 percent disability rating, Col. Taxin also observed that Maneely "developed a constellation of puzzling symptoms and has undergone an extensive work-up with a relative dearth of positive findings to support his symptomology." AR 173. Because "a formal diagnosis has not been determined," Col. Taxin recommended placing Maneely on the Temporary Duty Retirement List (TDRL) for further medical evaluation. AR 175.

DPPD reviewed Col. Taxin's opinion and issued its own brief recommendation, concurring with Col. Taxin's 60 percent rating but recommending permanent retirement instead of placement on the TDRL. AR 177. In addition, DPPD recommended a different diagnostic code. Having "reviewed the advisory from [Col. Taxin]," DPPD "opine[d] that [Maneely] did not meet the clinical criteria for chronic fatigue syndrome, but his symptoms should have been coded using VASARD code 5024, fibromyalgia, with a permanent disability rating of 60%." *Id.*

The AFBCMR issued its recommendation on December 17, 2007, finding sufficient relevant evidence to demonstrate the existence of an error or injustice.[11] AR 5. It first summarized the two advisory opinions, as follows:

> "The [AFBCMR] Medical Consultant has recommended the applicant be placed on the TDRL and opines that the severity of his symptoms at the time of his separation more closely approximates a rating of 60 percent, rather than 40 percent. [DPPD], upon considering the Medical Consultant's recommendation, noted, with the advantage of a three-year gap between his separation and today, that the applicant's disability when considered today would more closely approximate fibromyalgia, rather than chronic fatigue syndrome, and that permanent retirement, rather than placement on the TDRL, with a 60 percent disability rating would be the suitable action to take in this case."

*Id.* The AFBCMR then concluded that "in light of the differing opinions and noting that

---

[10] Per 10 C.F.R. § 4.88b, a 60% disability rating is appropriate where symptoms "are nearly constant and restrict routine daily activities to less than 50 percent of the pre-illness level," or where symptoms "wax and wane, resulting in periods of incapacitation of at least six weeks total duration per year."
[11] *See* 10 U.S.C. § 1552(a)(1).

both evaluations agree that a 60 percent disability rating is warranted, it is our opinion that the recommendation of DPPD, being in a position to render such determinations in these cases, appears to be the appropriate corrective action."[12] *Id.* Though the AFBCMR "considered [Maneely's] request that his disability rating be increased to 100 percent," it "concur[red] with the Medical Consultant's and DPPD's findings that any other conditions identified prior to [Maneely's] separation were appropriately identified as not unfitting at the time and therefore were not eligible for consideration during the adjudication and rating of his disability." *Id.* Accordingly, the AFBCMR recommended that Maneely's records be corrected to reflect a diagnosis of fibromyalgia, VASRD code 5025, rated at 60 percent. *Id.*

The AFBCMR's recommendation was adopted on December 19, 2007. AR 1. Maneely filed this action on June 14, 2010.

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

When a party files a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), "the plaintiff[ ] bear[s] the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction." *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 176 (D.D.C. 2004). Accepting as true all factual allegations in the complaint, the court must determine whether it is acting within the scope of its jurisdictional authority. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

### B. Rule 56

Rule 56 provides for entry of summary judgment if "there is no genuine dispute as to any

---

[12] *See* AFI 36-3212, ¶ 3.12 ("[DPPD] exercises operational, procedural and administrative supervision of the PEBs").

8

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of a final agency action under the APA, the normal summary judgment standard does not apply. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006). Instead, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* at 90. "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

### C. Reviewing Decisions of Military Corrections Boards

Federal courts review final decisions of military corrections boards, including the AFBCMR, under the APA standard. A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.*

The Secretary of the Air Force, acting through the AFBCMR, "may correct any military record of [his] department when [he] considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). Courts review the Secretary's decision under an "unusually deferential" application of the arbitrary or capricious standard. *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989); *see also Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000);

9

*Kight v. United States*, 850 F. Supp. 2d 165, 169-70 (D.D.C. 2012) *aff'd,* 12-5167, 2013 WL 1164035 (D.C. Cir. Mar. 1, 2013). "While the broad grant of discretion implicated here does not entirely foreclose review of the Secretary's action, the way in which the statute frames the issue for review does substantially restrict the authority of the reviewing court to upset the Secretary's determination." *Kreis*, 866 F.2d at 1514. The statute authorizes the Secretary to correct records "*when the Secretary considers it necessary* to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1) (emphasis added). "It is simply more difficult to say that the Secretary has acted arbitrarily if he is authorized to act '*when he considers it necessary* to correct an error or remove an injustice,' 10 U.S.C. § 1552(a), than if he is required to act whenever a court determines that certain objective conditions are met, i.e., that there has been an error or injustice." *Kreis,* 866 F.2d at 1514.

The substantial deference afforded military board decisions "is calculated to ensure that the courts do not become a forum for appeals by every soldier dissatisfied with his or her ratings," which would have the potential to "destabilize military command and take the judiciary far afield of its areas of competence." *Cone,* 223 F.3d at 793. A decision by the AFBCMR is not arbitrary and capricious if it "minimally contains a rational connection between the facts found and the choice made." *Frizelle v. Slater,* 111 F.3d 172, 176 (D.C. Cir. 1997). The district court is not to function as a "super correction board." *Charette v. Walker,* 996 F. Supp. 43, 50 (D.D.C. 1998). The standard of review "does not require a reweighing of the evidence, 'but a determination of whether *the conclusion being reviewed* is supported by substantial evidence.'" *Walker v. Shannon,* 848 F. Supp. 250, 255 (D.D.C. 1994) (quoting *Heisig v. United States,* 719 F.2d 1153, 1157 (Fed. Cir. 1983) (emphasis in original)).

## III. DISCUSSION

### A. Maneely's Constitutional Claims are Time-Barred

28 U.S.C. § 2401 provides for a six year statute of limitations for every civil action commenced against the United States, with exceptions not relevant here. This statute of limitations is "a jurisdictional condition attached to the government's waiver of sovereign immunity." *Hardin v. Jackson*, 625 F.3d 739, 740 (D.C. Cir. 2010) (internal quotations omitted).

Maneely's complaint asserts that the AFBCMR's 2007 decision contradicted applicable USAF regulations and thereby deprived him of his constitutional right to due process under the law. Compl. ¶¶ 82-91. However, as the Secretary correctly observes, all the violations alleged in Maneely's complaint took place during his initial disability evaluation process, which concluded with the SAFPC's final recommendation on December 17, 2003. *See* AR 67. Maneely did not bring this action until June 14, 2010, outside the six year limitations period. Furthermore, Maneely concedes that the constitutional claims are time-barred. *See* Pl's Opp. at 17, n.9, Dkt. #10. Accordingly, the Court grants the Secretary's motion to dismiss Maneely's constitutional claims.

### B. The Secretary's Motion for Summary Judgment

The Secretary urges the court to dismiss Maneely's APA claims on the ground that the AFBCMR's decision to award disability at 60 percent and not 100 percent was neither arbitrary nor an abuse of discretion. In reply, Maneely makes a series of related arguments, which the Court will address separately. He argues that the AFBCMR acted arbitrarily in adopting DPPD's recommendation, raising his disability rating to only 60 percent rather than 100 percent, failing to order additional medical tests, failing to assign a 100 percent disability rating where it was impossible for Maneely to engage in substantially gainful occupation, and failing to give him the

11

benefit of the "reasonable doubt" presumption that the AFBCMR uses to resolve different advisory opinions. Maneely also argues that the AFBCMR failed to adequately set forth its reasoning and gave no rational basis for its decision. As explained in more detail below, the AFBCMR based its decisions on substantial evidence in the record and offered adequate explanation, where required, for those decisions. Therefore, it met its burden under the APA and the Secretary is entitled to summary judgment.

### 1. Adopting DPPD's Recommendation

The AFBCMR received two advisory opinions, one from Colonel Edward Taxin, the AFBCMR's Medical Consultant, and one from DPPD, the division within USAF that supervises physical evaluation boards. According to Col. Taxin, while Maneely did not suffer from CFS, his symptomology could be coded by analogy to CFS. AR 175. DPPD also concluded that Maneely did not suffer from CFS, but opined that Maneely's condition most closely resembled fibromyalgia, and recommended coding his condition as fibromyalgia. AR 177.

Noting that both opinions recommended a 60 percent disability rating, the AFBCMR adopted DPPD's recommendation, finding that DPPD was "in a position to render such determinations in these cases." *Id.* The AFBCMR was referring to DPPD's role as the operational and administrative supervisor of the IPEB and FPEBs. *See* AFI 36-3212, ¶ 3.12. In other words, the AFBCMR recognized and gave weight to the medical boards whose responsibility it was to assign diagnostic codes and to decide whether an individual should be permanently retired or placed on the TDRL. As explained by the AFBCMR, DPPD had "the advantage of a three-year gap between [Maneely's] separation and today," and in DPPD's view, "the applicant's disability when considered today would more closely approximate fibromyalgia." *Id.*

Maneely complains that the AFBCMR gave inadequate explanation as to why it ultimately selected fibromyalgia. However, recognizing that Maneely's condition essentially defied a definitive diagnosis, and that the AFBCMR was choosing between two advisory opinions that largely concurred and both recommended a by-analogy code, the Court finds that the AFBCMR set out a sufficient rational explanation for its choices. Both advisory opinions found error or injustice in the prior 40 percent rating, both recommended a 60 percent disability rating, and both rejected CFS as Maneely's diagnosis.[13] Faced with two fundamentally similar opinions, the AFBCMR chose to adopt the one submitted by the office normally responsible for "render[ing] such determinations in these cases." *Id.* The AFBCMR apparently concurred with DPPD, and assigned some weight to the diagnostic perspective provided by the "three-year gap." AR 5. The Court finds this explanation satisfies the minimal "rational connection" required under the APA. *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995).

### 2. Raising Maneely's Rating to 60 Percent Rather Than 100 percent

Maneely argues that any fair reading of the administrative record would have produced a 100 percent disability rating, and that in fact Col. Taxin would have recommended a 100 percent rating but for an error that Maneely characterizes as either a "math error" or a "factual error." *See* AR 180; Pl's Opp. at 19.

According to Maneely, Col. Taxin misinterpreted various statements by Maneely's supervisors, McCasland and Moser, concerning Maneely's work schedule. Col. Taxin cited McCasland as stating that Maneely "was capable of working 3 or 4 hours during a duty

---

[13] To the extent Maneely argues that the AFBCMR acted arbitrarily in assigning the wrong code, or in permanently retiring him, he has not requested correction of his code or placement on the TDRL as relief in this action. *See* Compl. ¶ 92. Nor has he alleged any ways in which these elements of the decision affected his substantive rights, except perhaps insofar as placement on the TDLR would allow for further testing and a possibly higher disability rating upon his eventual retirement. Moreover, though Maneely correctly observes that the VASRD has no 60% percent rating for fibromyalgia, he proves too much. The VASRD gives 0, 10, and 40 percent disability ratings for fibromyalgia. 38 C.F.R. § 4.71a. If anything, Maneely benefitted from the AFBCMR's decision to adopt DPPD's 60 percent disability recommendation.

day…typically missing a day or two a week." AR 175. In his challenge to the AFBCMR's decision, Maneely emphasizes that McCasland's first memo to the IPEB actually said that Maneely was "*in his office* 3-4 hours per day, 4-5 days per week," *i.e.* not necessarily working. *See* AR 45, 180; Pl's Opp. at 21. However, McCasland also wrote, in a supplemental memo, that Maneely was "currently strong enough to deliver only 3 or 4 hours of work during a duty day…typically missing a day or two a week." AR 52.

Col. Taxin's interpretation is entirely consistent with McCasland's statements. Maneely's interpretation, on the other hand, strains credulity, presuming as it does that McCasland intended to distinguish between "in the office" and "working," despite McCasland's subsequent and straightforward clarification that Maneely could "deliver only 3 or 4 hours of work during a duty day." AR 52.

Kirt Moser, Maneely's immediate supervisor, also used the phrase "at the office" in describing Maneely's work schedule. AR 53 ("beyond the 12 to 15 hours at the office, he collapses and is, in essence, bedridden"). But as with McCasland's statement, the ambiguity disappears when read in the context of Moser's further assertion that Maneely "is able to spend only 3-4 productive hours before being overcome by fatigue and pain." AR 53. Furthermore, though Col. Taxin did not cite Maneely's own statement, Maneely himself submitted a letter to the MEB in which he stated that he was "able to work 2-4 hours/day, 4-5 days/week." AR 42.

Col. Taxin's estimate that Maneely's level of activities "diminished by between 50 to 100 percent of his normal duty performance" flows directly and logically from the supervisors' statements concerning Maneely's work schedule. AR 175. It is true that some of McCasland's and Moser's other statements paint a picture of a debilitating condition, arguably undercutting their estimates of how much work Maneely could actually perform – *e.g.* McCasland's statement

14

that Maneely was "no longer ever capable of performing as much as one quarter of the capacity he was when healthy," or Moser's assessment that Maneely was "currently functioning at less than 10 percent of his healthy capacity, and he continues to get worse." AR 52-53. But Col. Taxin did not rely on these vaguer evaluations, focusing instead on the more specific estimates about Maneely's work schedule. AR 175.

Though the AFBCMR did not adopt Col. Taxin's recommendation, it considered the recommendation and the underlying medical findings, as did DPPD, and they all reached the same conclusion about how much Maneely could work. AR 4-5, 177. It is not arbitrary or capricious to conclude that an applicant does not qualify for 100 percent disability when, by his supervisors' accounts, he can work 20 to 30 percent of a normal workweek.

### 3. Additional Medical Tests

Maneely argues that given his inconclusive diagnosis, the USAF acted contrary to its regulations[14] in failing to order additional medical tests prior to his retirement. Compl. ¶ 83; Pl's Opp. at 24-26. The record is clear and Maneely concedes that he had received no definitive diagnosis, and that he had undergone numerous medical tests. Pl's Opp. at 24. The AFBCMR considered the "pertinent medical facts" contained in Col. Taxin's report. AR 4. Those facts included Col. Taxin's observation that Maneely had "undergone an extensive work-up with a relative dearth of positive findings to support his symptomology," and "a formal diagnosis has not been determined." AR 173, 175. Maneely's treating physician, Dr. Goldman, stated that Maneely had undergone "exhaustive medical evaluation," including "[e]xtensive symptomatic treatment" and consultations with no fewer than seven specialists. AR 33. In light of Col. Taxin's opinion, Dr. Goldman's statement, and Maneely's own admissions, it was not arbitrary

---

[14] See Department of Defense Instruction 1332.38, paragraph E3.P3.6.1 ("when the evidence is not clear concerning a Service member's fitness, an attempt will be made to resolve doubt on the basis of further objective investigation, observation, and evidence").

to conclude that further medical tests would yield little additional information.

### 4. "Substantially Gainful Occupation"

Department of Defense Instruction (DoDI) 1332.39, paragraph 6.5, provides: "In cases in which the VASRD does not provide a 100 percent rating under the appropriate (or analogous) code, a member may be assigned a disability rating of 100 percent if the member's impairment is sufficient to render it impossible to engage in a substantially gainful occupation." The extent of a member's impairment is measured at the time the evaluation boards meet. *See* AFI 36-3212, paragraph 1.9. Having assigned a VASRD code for fibromyalgia, which does not provide an option for a 100 percent disability rating, the AFBCMR could nevertheless have raised the rating to 100 percent. Maneely argues that because his impairment rendered substantial gainful occupation impossible, it was arbitrary and capricious for the AFBCMR not to raise his rating accordingly. But as the word "may" in the instruction indicates, this was a discretionary matter.

On the record before it, the AFBCMR had statements from McCasland and Moser that Maneely could deliver at least some working hours during the week, and Col. Taxin reached the same conclusion. In addition, McCasland described Maneely's work product, when Maneely could deliver it, as "exemplary." AR 44. These statements supplied the AFBCMR rational grounds on which to conclude that substantially gainful employment was not "impossible" for Maneely. AR 45, 52-53, 175. AR 44. In light of that evidence in the record, the AFBCMR did not act arbitrarily or capriciously, or abuse its discretion, in declining to raise Maneely's rating.

### 5. "Reasonable Doubt"

DoDI 1332.39, Para. 6.2, provides that when two disability ratings could be applied, and there remains a reasonable doubt as to which should apply, such doubt is resolved in the applicant's favor. Maneely does not dispute that the AFBCMR received identical disability

ratings from its advisors. Instead he argues that but for Col. Taxin's "math" or "factual" error, the AFBCMR would have received differing advisory opinions, and would then have been compelled by the "reasonable doubt" instruction to adopt the higher rating. Compl. ¶ 88; Pl's Opp. at 30. Maneely's argument here merely repackages the claims already dispensed with in III(B)(2), *supra*. The AFBCMR treated the advisory opinions as identical with respect to the recommended disability rating because the opinions were identical in that respect. There was nothing arbitrary or capricious in that decision.

**NOW THEREFORE**, it is, hereby, **ORDERED** as follows:

1) Plaintiff's Motion for Summary Judgment is **DENIED**.

2) Defendant's Motion to Dismiss is **GRANTED** as to Count I.

3) Defendant's Motion for Summary Judgment is **GRANTED** as to Count II.

A separate Order consistent with this Memorandum Opinion shall be issued.

September 26, 2013

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE